**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: December 28 2007

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 04-36026 |
| | ) | |
| John Gaylord Pruden and | ) | Chapter 13 |
| Helen Ladonna Pruden, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### ORDER REGARDING OBJECTION TO PROOF OF CLAIM

This case is before the court on Debtors' Objection to Proof of Claim of Estate of Glenn Pruden ("Claimant") [Doc. # 56]. At issue are debts allegedly owed by John Pruden ("Debtor") to his father, Glenn Pruden, who is now deceased, that are secured by mortgages on Debtors' farm. Claimant contends that Debtor has made no payments on the debts owed to his father. The proof of claim states that Debtor owes $210,000 at 9.5% interest compounded annually from March 15, 1996, and $30,000 at 6.5% interest compounded annually from January 1996. Debtor objects to the proof of claim, arguing that it fails to take into account funds provided to his father for payment of these debts while he was alive. According to Debtor, the amount due and owing his father's estate as of the filing of this case is $17,209.12. A hearing was held that Debtor, his counsel and counsel for Claimant attended in person and at which the parties had the opportunity to present testimony and other evidence in support of their respective positions. Post-hearing briefs were subsequently filed by both Debtors and Claimant. [Doc. ## 120 & 121].

The court has jurisdiction over this case under 28 U.S.C. §1334 and the general order of reference

entered in this district. Proceedings to determine the allowance or disallowance of claims against the estate are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(B). This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, Debtors' objection will be sustained in part and denied in part. A final judgment will be entered after further briefing on the issue of the proper rate and calculation of interest on Claimant's claim as determined by the court in this order.

## FACTS

The claims at issue in this matter arise after years of financial dealings between Debtor and his father, Glenn Pruden. In making the following findings of fact, the court has no confidence that either Debtors or Claimant have presented evidence of the whole picture of the financial relationship between Debtor and his father or that anyone is even able to do so now. Debtor was the sole witness to testify at the hearing regarding the dealings with his father, who died testate in 2001. The testimony of Vera Pruden, Glenn Pruden's wife of 36 years and Debtor's stepmother, who is 84 years old, was presented by videotaped deposition. According to Vera Pruden, she has no knowledge of, and never discussed with her husband the financial transactions at issue in this case. She testified that a lot of the agreements or arrangements between her husband and Debtor were done "in private." As a result, she testified that she has no knowledge of any specific amounts owed by Debtor to his father's estate. Complicating the determination of facts in this case are the many inconsistencies with respect to both Debtors' evidence of payments made and Claimant's challenges to that evidence as is discussed more fully below. The court believes these inconsistencies are in large part the result of the laissez-faire approach of Debtor and Glenn Pruden in handling and reporting their business affairs between themselves and their less than candid disclosure to, and perhaps less than honorable dealings with, third parties with respect to their farming operations.

The claims at issue are based on only two transactions involving Debtor and his father – a payment for real estate taxes by Glenn Pruden on behalf of Debtors in 1994 and a 1996 purchase by and assignment to Glenn Pruden of a note and mortgage against Debtors' farm held by Metropolitan Life Insurance Company ("Met Life transaction"). Given the nature of the transactions at issue and the lack of any document that is a contemporaneous account of payments allegedly made by Debtor to his father, the court

2

finds it necessary to consider additional financial transactions involving Debtor and his father during the relevant time period. Besides the transactions specified by Claimant, transactions that must also be reviewed relate to Debtor's lease of his father's farm and payments by Glenn Pruden to Bill and Kathy Fair ("the Fairs") in satisfaction of an obligation owed to them by Debtor.

Debtor testified that a contemporaneous accounting of the debts owed and paid to his father, as well as other records (e.g. the number of hogs on the farm) were kept on a calendar in one of the buildings on his father's farm. However, the calendar was missing shortly after his father's death in September 2001. Debtor testified that he then began gathering documents and information in order to provide an account of his transactions with his father. Ultimately, Debtor created a ledger of his financial transactions with his father that he began in 2002 and that is based on, among other things, records of grain sales receipts, loan documents, tax records, Glenn and Vera Pruden's checking account ledger, and his own memory. Based on this ledger, Debtor contends that his father was paid in full for the real estate taxes paid by him on Debtors' behalf and calculates the amount owed to his father's estate in connection with the Met Life transaction to be $17,209.12 as of commencement of this case. Claimant disputes the accuracy of Debtor's ledger. While Vera Pruden testified that Debtor is current on his farm lease payments, Claimant argues that no payments at all have been made on the other debts owed by Debtor to his father.

With the exception of Vera Pruden's testimony regarding payments by Debtor on his lease obligation, Debtor provided the only testimony regarding the financial transactions to be considered and the background facts relevant to those transactions. The court addresses each of those transactions in turn, as well as Debtor's ledger of account with his father generally.

**1. Debtor's Lease of Glenn Pruden's Farm and Equipment**

Glenn Pruden owned an 80 acre farm in Van Wert County, 70 acres of which is tillable. His farm was located one-half mile from Debtors' 240 acre farm, which is located in both Mercer County and Van Wert County. Glenn Pruden owned no other farmland. In the late 1980's or early 1990's, Glenn Pruden suffered a stroke. Although she could not remember when it occurred, according to Vera Pruden the stroke left Glenn Pruden physically unable to engage in farming but did not affect him mentally.

Before that time, in 1982, Debtors entered into a five-year renewable agreement with Glenn and Vera Pruden for the lease of Glenn Pruden's farm and equipment, consisting of seventy acres of farmland, the farm machinery, two barns, two hog buildings, four grain bins and three hopper tanks. Under the lease agreement Debtor farmed his father's land, receiving all of the crops and paying the expenses. In consideration, the lease agreement requires Debtor to pay Glenn and Vera Pruden $10,000 per year and to

maintain and repair the farm and equipment as needed. Although initially the farming operation included hog operations, they were terminated in 1986. After hog operations were terminated, the annual lease payment, which Debtor refers to as the "cash rent," was decreased to $6,000 per year.[1] According to Debtor, the lease agreement has been continuously renewed over the years. Vera Pruden did not testify otherwise. Rather, her testimony that Glenn Pruden could not really engage in farming after his stroke and that Debtor took over supports a finding that Debtor has continued to lease his father's farm over the years, as does her testimony regarding her notation in her checkbook register for the period of January 1995 through December 2, 1996, for the checking account she jointly held with her husband. She had noted that "John is paid in full for the year until Nov[ember]" and testified that the notation refers to Debtor's obligation under the farm lease agreement. Vera Pruden testified that Debtor has paid all amounts due under the lease agreement.

**2. 1994 Real Estate Tax Payment**

On October 7, 1993, Debtors filed for relief under Chapter 12 of the Bankruptcy Code. [Case No. 93-32893]. In that case, the bankruptcy court entered an order authorizing Debtors to borrow up to $30,000 from Glenn Pruden at an annual interest rate of 6.5% for the purpose of paying Debtors' delinquent real estate taxes and to grant Glenn Pruden a mortgage in that amount that would be the first and best lien on Debtors' real property, notwithstanding any prior liens and encumbrances. [Claimant's Ex. 6]. On June 6, 1994, a check in the amount of $38,609 was drawn on the joint checking account of Glenn and Vera Pruden in order to purchase a cashier's check in that amount. [Debtors' Ex. M]. The cashier's check was made out and sent to the Chapter 12 trustee for payment of Debtors' real estate taxes and states that the remitter is John Pruden. [Debtors' Ex. N].

Also on June 6, 1994, a deposit was made to Glenn and Vera Prudens' joint checking account in the amount of $30,472.01. [Debtors' Ex. E and M]. A deposit in the amount of $8,532.07 had previously been made to the joint account on January 21, 1994. [Debtors' Ex. E, unnumbered pp. 2, 11].On December 28, 1995, Debtor executed the priority mortgage authorized by the bankruptcy court in the amount of $30,000 in favor of his father. [Debtors' Ex. O]. At the time of Glenn Pruden's death, a release of the mortgage had not been filed.

Debtor testified that both the January 21 and June 6 deposits were made with funds he had provided to his father for the purpose of paying Debtors' real estate taxes and, thus, that no debt is owed to his father in connection with the payment of the taxes. In support of the fact that Debtor provided the funds for the

---

[1] Although the lease payment has been at different levels, Debtor testified that the payment was basically $6,000 per year until it was increased to $7,000 in 2001 and then $10,000 in 2002 due to an increase in grain prices.

4

June 6 deposit, Debtor offered grain receipts for soybeans sold by Debtor between May 25 and June 2, 1994, in the total amount of $31,702.93. [Debtors' Ex. AA].

Notwithstanding the proof of claim relating to this transaction for the amount of $49,649.88, which was calculated based on the $30,000 mortgage at 6.5% interest, in its post-hearing brief, Claimant argues that Debtor owes $68,646.53, the calculation of which is based on the entire $38,609.89 payment with interest compounded at 6.5%. Claimant challenges Debtor's testimony that the June 6 deposit of $30,472.01 was from funds provided by Debtor. First, it argues that Debtors' Liquidation Analysis presented with their amended Chapter 12 plan in March 1994 includes neither grain in storage nor cash on hand and, therefore, that Debtor could not possibly have had funds from grain sales in June 1994. While it is true, for whatever reason, that Debtors' March 1994 Liquidation Analysis does not reflect the fact that Debtors owned grain in storage, [Claimant's Ex. 9, unnumbered p. 13], their Chapter 12 petition filed in October 1993 schedules as personal property on bankruptcy Schedule B "190 acres of soybeans growing" valued at $39,900, [Claimant's Ex. 28, Schedule B]. No testimony was offered regarding this discrepancy, when soybeans are harvested, or why the Liquidation Analysis did not include any soybeans in storage. It is clear, however, from the grain receipts that the sales of soybeans did occur in May and June 1994 and that John Pruden received 100% of the proceeds from those sales. [*See* Debtors' Ex. AA].

Claimant also offers Debtors' 1994 federal income tax return wherein Debtor states on his Schedule F, Profit or Loss From Farming, that he had gross sales of only $34,068.93 and total expenses of $69,523.24 for a net loss of $35,454.31. Debtors reported no other income on this return. Thus, Claimant argues that Debtor could not have made payments to his father of over $38,000 in 1994. While the court agrees that Debtors' income tax return does not support a finding that he made the sizeable payment claimed by him, the court does not find the income tax returns introduced into evidence in this case to be a reliable indicator of funds available to Debtor. Debtor testified that Glenn Pruden continued to report grain sales on his own income tax returns since, according to Debtor, it gave him a "feeling of worth." Indeed, Glenn Pruden's 1998 income tax return reports gross farm rental income based on production of grains and other crops in the amount of $78,785 and states that he actively participated in the operation of the farm. However, both Vera Pruden and Debtor testified that Glenn Pruden was no longer able to engage in farming activities after his stroke, which occurred in the late 1980's or early 1990's according to Debtor. In addition, Glenn Pruden had leased all of his tillable farmland and farm equipment to Debtor since 1982. There is no provision in the lease agreement requiring Debtor to pay rental income based on the production of crops or to share the profits of any grain produced on the land with his father. The lease simply requires Debtor to pay a fixed

5

annual payment. This lease covers the only farmland that was owned by Glenn Pruden.

The court notes that Debtor granting Glenn Pruden a priority mortgage in connection with the real estate tax transaction over eighteen months after the real estate taxes were paid is also inconsistent with his testimony that he provided the funds for payment of the taxes. The reason for granting this super priority mortgage to his father in December 1995 was not explored at the hearing and the court will not surmise as to the purpose of doing so.[2] Likewise, Vera Pruden's testimony that she was aware of all of her husband's assets and that she did not know where her husband would have gotten the money to make the $38,609 real estate tax payment is inconsistent with Claimant's contention that the funds were loaned to Debtor by Glenn Pruden. In light of this testimony as well as her testimony that she has no knowledge regarding the transactions at issue in this case, the court gives little or no weight to Vera Pruden's affirmative response to the following question posed by her attorney: "[T]o your knowledge . . . the only one depositing funds and the only funds that were represented by your accounts would have been those of yours and Glenn's?" Claimant offered no evidence of a source of funds available to Glenn Pruden that would allow him to make the substantial deposits covering the check used to pay the real estate taxes. Notwithstanding the inconsistencies, for the reasons already discussed, the court credits Debtor's testimony that the funds were provided by him.

**3. Met Life Transaction**

In 1978, Debtors executed a note in the principal amount of $210,000 with interest to accrue at 9.5% per annum in favor of Met Life ("Note"). The Note was secured by a mortgage on the real property owned by Debtors (the "Mortgage"). [Claimant's Exs. 1 and 2]. A final payment on the Note was due on June 1, 1993. The Note provided that "[i]f any part of the principal or interest is not paid at maturity it shall bear interest thereafter at the rate of 8 percent per annum." [Claimant's Ex. 1].

In April 1995, during the course of Debtors' Chapter 12 case, the bankruptcy court granted Met Life

---

[2] Debtors attempt to explain in their post-hearing brief as follows:

> [The $30,000 mortgage] was signed in December 1995 and recorded in January 1996. Chronologically, the mortgage assignment from Metropolitan that had been prepared in September 1995 was not yet assigned due to lack of payment and the foreclosure [of Debtors' farm] was continuing on behalf of Metropolitan. It is at that point in the midst of the foreclosure, a year and a half later[,] that the $30,000 mortgage granting "priority over all other mortgages of record" is filed.

[Doc. # 120, p. 10]. However, this explanation sets forth facts that are not in evidence.

6

04-36026-maw    Doc 142    FILED 12/28/07    ENTERED 12/28/07 11:33:39    Page 6 of 15

relief from stay and abandonment of Debtors' real property.[3] [Case No. 93-32893, Doc. # 65]. On March 15, 1996, the sum of $195,722.43 was paid to Met Life in satisfaction of the amount owed by Debtors. Of the total amount paid, $105,722.43 was paid from the joint checking account of Glenn and Vera Pruden. The remaining $90,000 was, in essence, borrowed from Debtors' neighbors William and Kathy Fair ("the Fairs"). [*See* Debtors' Exs. R and S]. Debtors entered into a "Purchase Agreement" with the Fairs wherein the Fairs agreed to purchase 120 acres of farm land owned by Debtors for $90,000. The agreement provides that the Fairs deposit $90,000 as earnest money and that Debtors "may use the earnest money to immediately pay Metropolitan Life Insurance to have Metropolitan Life Insurance's mortgage on the property assigned to Glenn Pruden." [Debtors' Ex. S, p. 1]. An Addendum to Purchase Agreement gives Debtors the right to rescind the purchase agreement by repayment of the $90,000 "plus simple interest to date of payment at the rate of 5.5% per annum," which right Debtors were required to exercise no later than March 7, 1997. [*Id.* at unnumbered p. 3]. The Met Life Note and Mortgage were assigned to Glenn Pruden by reason of an Assignment of Mortgage dated September 25, 1995,[4] and recorded on March 15, 1996. [Debtors' Ex. T]. At the time of his death, a release of the Mortgage had not been filed.

On March 7, 1996, the same date that the $105,722.43 was paid from Glenn and Vera Pruden's checking account, a deposit to their account was made in the amount of $82,300. Debtor testified that he provided the funds for that deposit and that the source of those funds were checks he received from Pure Line Food in the amount of $42,300 and P&L Fertilizer in the amount of $40,000. Debtor did receive a check in the amount of $42,300 on March 7, 1996, from Pure Line Food.[5] [*See* Debtors' Ex. Y]. The back of the check is endorsed first by Debtor and then by Glenn Pruden, suggesting that the check was in fact signed over to Glenn Pruden for deposit into his checking account. [*See id.*]. Although Claimant again argues that Debtors' 1996 income tax return is inconsistent with Debtor's testimony since they report only $60,011.47 in gross sales from farming operations for that year, as the court explained above, it does not find the income tax returns admitted as exhibits in this case to be accurate indicators of funds available to Debtor.

---

[3] The court takes judicial notice of the contents of the case docket. Fed. R. Bankr. P. 9017; Fed. R. Evid. 201(b)(2); *In re Calder*, 907 F.2d 953, 955 n.2 (10th Cir. 1990).

[4] At the hearing, the parties provided no explanation as to why the mortgage was assigned to Glenn Pruden in September 1995 before Met Life had actually been paid the $195,722.43. In their post-hearing brief, Debtors suggest that, although the mortgage assignment was prepared in September 1995, it was not delivered to Glenn Pruden until Met Life received full payment in March 1996.

[5] In support of his testimony regarding the $82,300 deposit, Debtor also offers a check stub from P&L Fertilizer. However, the check stub provides no information regarding a date or amount of the check. [*See* Debtors' Ex. Z].

7

In support of their position as to the amount owed by Debtor to his father's estate as a result of the Met Life transaction, Claimant offers a letter dated October 14, 1998, that is addressed to the Fairs' attorney from Glenn Pruden's attorney at that time. The letter was faxed as a cover sheet to the fax transmittal of the Met Life Note and Mortgage that was assigned to Glenn Pruden and states as follows: "Following are the note and mortgage regarding Glenn Pruden. The Mortgage was assigned to Glenn by Metropolitan. It is the first mortgage on the properties. Since John has made no payments to Glenn, the mortgage currently secures approximately $237,000 including interest to October 1." [Claimant's Ex. 11].

For the following reasons, the court gives little weight to the accuracy of statements made in this letter. First, only $105,722.43 was paid to Met Life from Glenn Pruden's account; the other $90,000 was provided by Debtor from money borrowed from the Fairs. Therefore, even if the entire $105,722.43 plus interest was then owed by Debtor to his father, the statement that the mortgage secures approximately $237,000 including interest just over two and one-half years after the debt was incurred is grossly overstated. Second, evidence of the check received by Debtor from Pure Line Food on March 7, 1996, and signed over to his father convinces the court that it is more likely than not that Debtor provided at least some of the funds that were deposited into Glenn and Vera Pruden's checking account and used to pay Met Life. Third, the court assumes that Glenn Pruden also provided some of the funds used to pay Met Life since he ultimately received the assignment of the Note and Mortgage. Nevertheless, even if it is true that Debtor had not paid anything on the amount owed to his father on account of the Met Life transaction, the letter sheds no light on what amount was actually owed by Debtor to his father at the time the transaction was completed, that is, what amount Debtor contributed and what amount his father contributed in order to make completion of the transaction possible. And finally, the court notes that the letter was sent on October 14, 1998, approximately one week before Glenn Pruden executed a promissory note in favor of the Fairs in settlement of a lawsuit filed by them as a result of Debtor's failure to repay the $90,000 borrowed from them as discussed below. Glenn Pruden had some incentive to lead the Fairs to believe that the mortgage held by him secured a greater debt than was actually owed. In any event, Claimant offers no testimony or evidence as to the basis for the statements made by Glenn Pruden's attorney in the letter.

**4. 1998 Payments in Satisfaction of Amount Owed to the Fairs**

Debtors failed to repay the $90,000 borrowed from the Fairs and apparently also failed to close on the Purchase Agreement entered into with the Fairs. As a result, the Fairs filed a lawsuit in state court against both Debtors and Glenn Pruden, who also had an interest in the property in issue under the assigned Met Life mortgage. On October 22, 1998, Glenn Pruden executed a promissory note in favor of the Fairs

8

in settlement of the lawsuit. [*See* Claimant's Ex. 13]. On November 24, 1998, a check in the amount of $111,124 was issued from the checking account of Glenn and Vera Pruden to attorney Steve Keister as payment to the Fairs in satisfaction of the promissory note. [Debtors' Ex. W]. In addition, $3,333 had previously been paid to the Fairs from Glenn and Vera Pruden's account on December 31, 1996. This payment was also made on the debt owed by Debtors to the Fairs.

In order to pay the Fairs, Glenn Pruden cashed in certificates of deposit in the amount of $43,106.58, which was deposited into his checking account on November 16, 1998. [*See* Debtors' Ex. V and H]. In addition, on November 18, 1998, a deposit in the amount of $78,720.42 was made to the account. [*Id.*]. These funds were the proceeds of a loan obtained through the United States Department of Agriculture that was secured by 14,427 bushels of soybeans. [*See* Debtors' Ex. X]. The Farm Storage Note and Security Agreement ("USDA Security Agreement") indicates that Glenn Pruden was the producer of those soybeans and, in fact, Debtor signed the agreement on behalf of Glenn and Vera Pruden.[6] Nevertheless, Debtor testified that the loan proceeds were secured by soybeans grown on his farm and that the obligation to repay the loan was satisfied by his delivery of the soybeans in August 1999. Debtor did not explain the discrepancy between his claimed ownership of the soybeans and the USDA Security Agreement naming Glenn Pruden as the producer, nor was such an inquiry made of him at the hearing.[7] He testified, however, that his father's farm was not capable of yielding the over 14,000 bushels of soybeans that served as collateral for the loan. Claimant offered no testimony to the contrary. The USDA Security Agreement also provides some support for Debtor's ownership of the soybeans in that it indicates that the commodity storage location is in Van Wert County and Mercer County, the two counties in which Debtors' farm is located. Glenn Pruden's farm, on the other hand, is located only in Van Wert County. While Claimant disputes Debtor's testimony regarding his interest in the loan proceeds by again pointing to Glenn Pruden's 1998 federal income tax return on which he reported $78,785 in income from production of grains and other crops, for the reasons already discussed above, the court does not find the tax return to be reliable evidence of Debtor's interest, or lack thereof, in the loan proceeds obtained in November 1998.

### 5. Debtor's Ledger of Account with Glenn Pruden

Debtor testified that he had not had his own checking account since the early 1990's because

---

[6] The security agreement is signed "Glenn Pruden by John Pruden" and "Vera Pruden by John Pruden." [Debtors' Ex. X].

[7] On Debtor's cross-examination, it was suggested by counsel that Debtor was at one time under a disability from participating in government grain programs. While this may have been the reason for representing that Glenn Pruden was the producer of the soybeans, it is not clear in what years Debtor was unable to participate in the programs.

9

Internal Revenue Service had attached his account for payment of a tax debt owed by him. Therefore, in dealing with his father, Debtor testified that he periodically made payments to his father that were deposited into the joint checking account of his father and Vera Pruden and that are listed in his ledger of account with Glenn Pruden that is admitted as Debtors' Exhibit C. These deposits then covered his lease payments and, according to Debtor, other payments relating to the financial transactions at issue. That Debtor conducted business with his father in this manner is supported by Glenn and Vera Pruden's checking account register and Vera Pruden's testimony. According to Vera Pruden, her husband had no other bank account other than two certificates of deposit. There are no deposits made to the checking account for the exact amount of the lease payments. Rather, there are multiple entries for deposits made for various amounts that Debtor attributes to payments he made to his father. While there are monthly deposits relating to Social Security payments to Glenn and Vera Pruden as well as monthly deposits of certain small interest payments, Claimant offers no evidence of a source of funds that would otherwise account for the deposits listed in Debtor's ledger.

Although Claimant challenges several of the larger deposits made to the account as already discussed above, it does not specifically challenge the remaining deposits claimed by Debtor to have been made in payment of debt obligations owed to his father. According to Debtor, source documents supporting the fact that he provided the funds for the other deposits listed in his ledger include check stubs and grain receipts similar to those presented in support of some of the larger deposits discussed above. Those additional source documents, however, were not offered into evidence at the hearing.

Claimant does offer Debtors' federal income tax returns for the years 1994 through 2001 as evidence that their income does not support a finding that Debtor made the total payments to his father that he claims to have made. However, as the court already explained, it does not find either Debtors' or his father's income tax returns reliable indicators of funds available to Debtor for payment of his debts.

Claimant also challenges Debtor's ledger to the extent that it shows that a positive balance of $11,531.70 in favor of Debtor existed at the time Debtors filed their Chapter 12 petition in October 1993. Debtors scheduled only $20 as their interest in checking, savings or other financial accounts on their bankruptcy Schedule B filed with that petition. While it is troubling that Debtors did not disclose their interest in funds deposited into Glenn and Vera Pruden's account, the first deposit recorded in Debtor's ledger in the amount of $13,531.70 made on October 15, 1992, was also recorded by Vera Pruden in her check register with a notation that it included two checks for grain. As discussed above, Glenn Pruden was not involved in the farming operations by that time except to the extent that he had leased his farm to

10

Debtors.

Nevertheless, the court finds that several of the entries recorded by Debtor in his ledger as payments to his father are not supported by the record. All of the "payments" listed in Debtor's ledger are supported by deposits for the same amount recorded in Glenn and Vera Pruden's check register with the exception of the following: $8,591.36 on September 23, 1996; $10,154.38 on April 15, 1998; and $24,000 on November 16, 1998. As the $8,591.36 alleged payment is completely unsubstantiated, the court disregards that entry on Debtor's ledger. The $10,154.38 payment recorded on the ledger as being made on April 15, 1998, was actually the balance recorded in the check register on that date. The court also disregards that entry on Debtor's ledger. With respect to the $24,000 on November 16, 1998, Debtor testified that the entry actually represents funds that Glenn Pruden contributed in order to pay the Fairs. As such, it is incorrectly added into the ledger as a payment to Glenn Pruden.

With these adjustments, Debtor's ledger reflects the following:

1. After the June 6, 1994, payment from Glenn and Vera Pruden's joint checking account in the amount of $38,609.89 for real estate taxes owed by Debtors, there was a positive balance in favor of Debtor in the amount of $5,925.89.
2. After the March 7, 1996, payment from the joint account in the amount of $105,722.43 to Met Life, there was a negative balance indicating that Debtor owed his father $7,971.27.
3. As of December 17, 1996, there was again a positive balance in favor of Debtor in the amount of $374.29. Thus, on this date, the ledger reflects that any amount owed to Glenn Pruden with respect to the $105,722.43 payment in connection with the Met Life transaction had been paid.
4. In November 1998, immediately before the payment from the joint account in the amount of $111,124 that was made in satisfaction of the obligation owed to the Fairs, there was a positive balance in favor of Debtor in the amount of $79,629.07.[8] Immediately after the $111,124 payment was made, there was a negative balance indicating that Debtor owed his father $31,494.93.
5. As of February 28, 2001, after which Debtor lists no further payments on account of the claims at issue in this case, the ledger reflects a negative balance indicating that Debtor owed his father $28,483.14.

---

[8] The court arrives at this figure by adding to the starting balance on October 15, 1992, amounts attributed as payments to Glenn Pruden by Debtor and deducting amounts representing Debtors' "cash rent" obligation and amounts paid from Glenn and Vera Pruden's account on behalf of Debtors. The court notes that although a $3,333 payment to Bill Fair is entered on the ledger as being made on November 24, 1998, it was actually made on December 31, 1996. [*See* Debtors' Ex. G]. The court has, therefore, deducted this amount in calculating the balance in the ledger account before the $111,124 payment was made.

11

Debtors filed for bankruptcy relief under Chapter 13 of the Bankruptcy Code on July 19, 2004. Claimant filed a timely proof of claim and Debtors filed their objection on March 10, 2005. The parties stipulate and agree that the amount of the claim as filed is inaccurate. In the proof of claim, Claimant asserts that $210,000 at 9.5% interest, for a total of $434,042.49 as of March 15, 2004, is owed by Debtor on account of the Met Life transaction, and $30,000 at 6.5% interest, for a total of $49,649.88, is owed by Debtor on account of the real estate tax payment and the $30,000 mortgage granted to Glenn Pruden. In the proposed stipulation filed by the parties before the hearing on Debtors' objection, Claimant asserts that the balance due on the date of filing was $409,483.19 on account of the Met Life transaction and $68,646.53 on account of the real property tax payment. Finally, in its post-hearing brief, Claimant asserts the same amount owed on account of the real property tax as stated in their pre-hearing stipulation but assert that $372,114.16 is owed on account of the Met Life transaction, which amount is calculated on a principal balance of $195,722.43 with interest compounded at 8%. Based on Debtor's re-created ledger before the adjustments made by the court, Debtors assert that only $17,209.12 is owed to Glenn Pruden's estate.

## LAW AND ANALYSIS

A proof of claim timely filed is deemed allowed unless a party in interest objects to it. *See* 11 U.S.C. § 502(a) and (b)(9). If an objection is made, "the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount," except as provided under § 502(b). 11 U.S.C. § 502(b).

A proof of claim constitutes "*prima facie* evidence of the validity and amount of the claim." Bankruptcy Rule 3001(f). The party objecting to the claim bears the initial burden of producing sufficient evidence to rebut the presumption of validity given to the claim. *In re Leatherland*, 302 B.R. 250, 258-59 (Bankr. N.D. Ohio 2003). "The burden then shifts to the claimant to prove the validity and amount of the claim by a preponderance of the evidence. While the burden of going forward shifts during the claims objection process, the ultimate burden of persuasion is on the claimant to prove the claimed entitlement." *Id. But see Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000) (holding that when the substantive law creating a tax obligation puts the burden of proof on the taxpayer, the burden of proof remains with the taxpayer in the proof of claim context).

In this case, Claimant's proof of claim alleges that it is owed two debts secured by mortgages on Debtors' real property. The debts are based on the $30,000 mortgage granted to Glenn Pruden, as authorized by the bankruptcy court in Debtors' Chapter 12 case to secure a loan in order to pay Debtors' real property taxes in 1994, and on the Met Life Note and Mortgage assigned to Glenn Pruden in 1996.

12

It is apparent, however, that the parties have struggled, much as the court has, to sort out the facts in determining the amount actually owed by Debtors on account of these debts.[9] While Debtors admit that such funds were paid on their behalf and that they owe some amount of money to Glenn Pruden's estate, they disagree that the amount is as set forth by Claimant. Debtors do not dispute, however, that the amount owed by them is secured.

Claimant argues that the evidentiary burden in this matter has not shifted because Debtors failed to provide sufficient evidence to rebut the presumption of validity afforded the proof of claim. The court disagrees. Debtors presented substantial evidence and testimony that the deposits to the joint checking account listed in their ledger consisted of funds provided by Debtor. As detailed above, Debtor's testimony regarding several of the largest deposits is supported by documentation of funds received by him during the relevant time frames that provided him the funds to make the deposits and, in one case, documentation of a check payable to Debtor that he endorsed over to Glenn Pruden. Claimant offered no evidence demonstrating that these deposits were actually made with funds belonging to Glenn and/or Vera Pruden. In fact, Vera Pruden's testimony that she was aware of all of her husband's assets and that she had no knowledge of where he would have gotten the money to make the several large deposits claimed by Debtors to be from Debtors' own funds supports Debtors' position. Debtor's testimony that certain funds from the sale of soybeans that were deposited into his father's account were funds contributed by Debtor is further supported by Vera Pruden's testimony that her husband was physically unable to engage in farming operations after he had suffered a stroke, together with the written agreement to lease his father's farm and farm equipment requiring Debtor to pay an annual "cash rent" payment rather than basing rental income on profits from the production of crops. For the reasons previously discussed, the court finds neither Glenn Pruden's 1998 income tax return nor Debtors' tax returns that were admitted as evidence at the hearing on this matter to be helpful in determining the true nature of the financial ability of either Debtors or Glenn Pruden.

While the court finds that Debtors have met their burden of producing evidence that rebuts the presumption afforded the proof of claim in this case, the court notes that the parties have also stipulated that "the amount of the Claim as filed is inaccurate. . . ." [*See* Doc. # 114, ¶ 4]. This stipulation alone is sufficient to overcome the presumption of validity. It was, therefore, Claimant's burden to prove its claim by a preponderance of the evidence. Claimant has failed to offer persuasive evidence or testimony that

---

[9] The confusion as to the amount owed by Debtors is demonstrated, in part, by the conflicting positions taken by Claimant in various documents filed with the court regarding the amount it asserts is owed by Debtor.

would support its arguments that the deposits at issue were from a source other than Debtors and that Debtors have made no payments on the claims at issue in this case.

Nevertheless, Debtors admit owing Glenn Pruden's estate money in accordance with Debtor's ledger of account with his father, which amount Debtors calculate at $17,209.12 as of the date of filing. While the court finds both Debtor's testimony and his ledger support a finding as to the amount owed to Glenn Pruden's estate, the ledger, adjusted as discussed above, does not support the figure calculated by Debtors. Rather, as of February 28, 2001, the date after which Debtor lists no further payments were made on account of the claims at issue, the adjusted ledger reflects a negative balance indicating that Debtor owed his father $28,483.14. This debt is on account of the money paid in November 1998 by Glenn Pruden to the Fairs on Debtors' behalf in order to satisfy their obligation on the $90,000 loan obtained from the Fairs in order to have the Met Life Note and Mortgage assigned to Debtor's father. The court reaches this conclusion based upon the balance of Debtor's account with Glenn Pruden in his ledger, as adjusted by the court, in November 1998 immediately before the $111,124 payment to the Fairs. At that time, the balance was $79,629.07 in Debtor's favor. Thus, as of that date, no debt was owed on account of the real property tax payment[10] or on account of the funds advanced by Glenn Pruden in order to purchase the Met Life Note and Mortgage in March 1996.

While the court finds that interest may be allowed from the date the debt owed by Debtors was incurred until the date they filed their bankruptcy petition, in light of the court's findings, the rate at which the interest should be calculated and the calculation itself is not clear. As to the interest rate, the court questions whether it is governed by the provisions of the Met Life Note, the provisions of Debtors' agreement with the Fairs, or by the statutory rate under Ohio Revised Code §§ 1343.03 and 5703.47 and, if under the statutory rate, which year should be used in determining the proper interest rate.

As to the calculation itself, regardless of whether the Met Life Note, the agreement with the Fairs, or the statutory rate governs the rate of interest, Claimant has improperly calculated the amount of their claim by compounding interest. "Simple interest is to be used when there is no specific agreement to compound interest or a statutory provision authorizing the compound interest." *Berdyck v. Shinde*, 128 Ohio App. 3d 68, 87 (1998) (citing *State ex rel. Elyria v. Trubey*, 20 Ohio App. 3d 8 (1984)). Ohio Revised Code §§ 1343.03 and 5703.47 do not authorize compound interest. To the extent that the agreement with the Fairs governs the interest rate, the agreement provides only for simple interest. And to the extent that the Met

---

[10] In fact, after the June 6, 1994, payment for real property taxes, there was a positive balance in favor of Debtor in the amount of $5,925.89, indicating that no debt had actually been incurred on account of that payment.

14

Life Note governs the rate of interest, the court disagrees with Claimant that it provides for compound interest after its maturity date. Claimant relies on the following provision in the Note: "If any part of the principal or interest is not paid at maturity it shall bear interest thereafter at the rate of 8 percent per annum." [Claimant's Ex. 1]. There is no dispute that this provision applied to the Note when it was assigned to Glenn Pruden since it was assigned after its expiration date of June 1, 1993. This provision, however, permits calculation of interest from the date the Note matured only on the total amount owed on that date, which includes principal and interest; it does not also provide for compounding the interest thereafter.

Although it is clear that only simple interest may be used, the calculation of interest is complicated by the fact that immediately after the November 24, 1998, payment of $111,124 to the Fairs, Debtors owed Glenn Pruden $31,494.93, not the $28,483.14 owed as of February 28, 2001. Between November 24, 1998, and February 28, 2001, several "cash payments" were deducted in satisfaction of Debtors' lease obligations and a number of deposits credited to Debtors were also made. The court will allow the parties to address both the proper calculation of interest during this time period and until the date Debtors' petition was filed and the proper rate of interest to apply to the debt owed by Debtors before it enters a final judgment in this matter.

**THEREFORE**, for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Claimant shall file a brief addressing the proper rate and calculation of interest as discussed in this order on or before January 14, 2008, and that Debtors shall file their response on or before January 28, 2008.